**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

EDDIE HICKS,

               Petitioner,

vs.

CHRIS TRIPP,

               Respondent.

No. 22-CV-1016 CJW-MAR

**ORDER DISMISSING PETITION
UNDER 28 U.S.C. § 2254**

_____

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................. 4

II.    BACKGROUND ................................................................. 4

     A.    The Crime, Trial, and Appeal .................................................. 4

     B.    Petitioner's First State Post Conviction Relief Case .......................... 8

     C.    Petitioner's Second State PCR Case .......................................... 10

     D.    Petitioner's Federal PCR Case ................................................ 11

III.   STANDARDS FOR SECTION 2254 HABEAS CORPUS RELIEF ............. 12

IV.   LEGAL STANDARDS ........................................................ 14

     A.    FED. R. CIV. P. 8 ............................................................ 14

     B.    FED. R. CIV. P. 12(b)(1) ..................................................... 14

     C.    FED. R. CIV. P. 12(b)(6) ..................................................... 15

D.      Pro Se Pleadings ......................................................................17

V.      PETITIONER'S GROUNDS FOR RELIEF.............................................17

VI.      DISCUSSION.................................................................................19

     A.      Approaches to Mixed Petitions ..................................................19

     B.      Petitioner's Unexhausted Claims ...............................................20

     C.      Petitioner's Exhausted Claims ...................................................21

         1.      Alleged *Brady* Violation.................................................22

         2.      Alleged *Miranda* Violations.............................................25

             a.      Petitioner's First Statements at the Hospital ..................26

             b.      Petitioner's Statement the Following Day.....................26

         3.      Alleged Ineffective Assistance of Counsel...........................30

             a.      Failing to Evaluate or Obtain an Expert on Glass Shards......................................................32

             b.      Discovery of the Glass Shards ..................................33

             c.      Failure to Obtain Expert to Testify About Petitioner's PTSD ...............................................................34

             d.      Petitioner's Post-Conviction Ineffective Assistance Claims ..............................................................36

         4.      Alleged Insufficient Evidence..........................................36

a.    Sufficiency of the Evidence on Intoxication
Defense Theory ...................................................38

b.    Sufficiency of the Evidence on the Self-Defense
Claim Theory ......................................................41

VII.    CERTIFICATE OF APPEALABILITY................................................43

VIII.    CONCLUSION ...........................................................................44

# I.    INTRODUCTION

This matter is before the Court on respondent's December 5, 2022 motion to dismiss petitioner Eddie Hicks' ("petitioner") Petition Under Title 28, United States Code, Section 2254 for Writ of Habeas Corpus by a Person in State Custody.  (Docs. 17; 20).  After petitioner failed to respond to the motion, on January 5, 2023, the Court ordered him to show cause by January 31, 2023, why the Court should not dismiss his case.  (Doc. 21).  On January 10, 2023, petitioner filed a response.  (Doc. 22).  On January 12, 2023, petitioner filed a supplement to his response, attaching a request for production of documents he filed in a state court post-conviction relief petition.  (Doc. 23).  On January 17, 2023, petitioner filed a "Motion to move forward," which the Clerk of Court appropriately filed, and the Court interprets as a response to the Court's order requiring him to show cause for why he failed to timely respond to respondent's motion to dismiss.  (Doc. 24).

For the following reasons, the Court **grants** petitioner's "Motion to move forward" (Doc. 24) and accepts his untimely response and supplemental response.  The Court also **grants** respondent's motion to dismiss (Docs. 17; 20), **denies** petitioner's petition for habeas relief (Doc. 1) and enters judgment against petitioner and in favor of respondent.

# II.    BACKGROUND

## A.    *The Crime, Trial, and Appeal*

On direct appeal from his state court conviction for first degree murder, the Iowa Court of Appeals summarized the pertinent facts and procedural history up to that point in time.  *State v. Hicks*, No. 17-0130, 2018 WL 1433788 (Iowa Ct. App. Mar. 21, 2018).  Having reviewed the state court documents (Doc. 15), the Court finds this recitation accurate and repeats it here.

4

Hicks and Lemon began dating in 2006 in Chicago. They had a tumultuous relationship marked by infidelity and abuse. They separated after an argument in May 2015. Around Memorial Day that year Hicks called Lemon's mother threatening to "flatten [Lemon's] head into a pancake" and saying "[Lemon] is going to be one daughter [she] don't have anymore." Hicks also said he recently discovered Lemon had misrepresented how old she was and because she was underage when their relationship began, Hicks expressed concern he "could be doing time as a result." Around the same time, Hicks called Lemon's sister with this dark message: "[Y]ou all going to catch you all sister in the casket; tell your mama to get this casket ready."

Hicks and Lemon reconciled on June 12, 2015. They took a bus from Chicago to Dubuque four days later. When they arrived in Dubuque, according to Hicks, "everything was fine." But Hicks later began to feel faint and sought medical attention. The next day started off as uneventful. Lemon went to work; later they picked up Hicks's medication, ate, smoked marijuana, and napped.

Hicks later said that upon waking up, he accessed Facebook on his phone, prompting an argument with Lemon. According to Hicks, he got up and went into the bathroom and Lemon threw a phone at him. Then the fight turned physical and Hicks recalled Lemon trying to hit him with a frying pan and stab him with a paring knife. Hicks said he returned Lemon's attacks.

Eventually, he fled the apartment and demanded water and alcohol from neighbors. A witness hanging out with friends at another apartment said she heard "somebody was yelling for help" and found Hicks with "blood all over him." She went to get water, but when she came back, Hicks was demanding alcohol, or "otherwise he's going to kill [them.]" Another witness gave Hicks a half-full bottle of Paramount rum and he "chugged it all."

Police responded to two 911 calls reporting a stabbing. One of the callers reported Hicks falling from a ten-foot retaining wall outside the apartment building. In an alley near Lemon's apartment, officers found Hicks sitting on the ground, bleeding from "a couple stab wounds." As the squad car pulled up, the first responding officer planned to render medical aid, but then she saw Hicks "scooting" toward her. Hicks started to grab the officer's leg and try to force his way into her squad car, so she pinned him against the door and sprayed him with mace. The second officer to arrive observed that Hicks's conduct veered from erratic to calm. Hicks

5

was able to answer the officer when asked for his first and last names, where he was staying, and what happened. Hicks said he'd been "stabbed up." Hicks also identified Kahdyesha as the person who stabbed him.

Emergency medical personnel loaded Hicks onto a cot and into an ambulance. He was handcuffed to the cot and a police officer rode along in the ambulance to the hospital. An emergency room doctor described Hicks as "intermittently agitated" and recalled at times "his language was difficult to understand" and other times he "spoke very clearly." Hicks had benzodiazepines, alcohol, and phencyclidine (PCP) in his system, according to a toxicology report.

Before he was sedated by medical staff so they could treat his injuries, Hicks spoke briefly with Officer Cory Tuegel in the emergency room. Tuegel asked Hicks just seven questions, starting with "what happened?" Hicks responded: "I loved her too much." Hicks clarified he was talking about his girlfriend, Kahdyesha Lemon. Hicks said Lemon was "home sleeping" but also acknowledged she suffered stab wounds. Hicks soon ended the conversation.

Back at the apartment building, officers discovered Lemon outside, suffering from more than one-hundred incised stab wounds. Inside the apartment, the floors were so soaked in blood that it was difficult for officers to keep their footing. Blood splatter glazed the walls of the bedroom, kitchen, and bathroom. An officer testified he could not remember an area of the home not covered in blood. Officers found a bent frying pan matted with hair and blood. Officers also located a paring knife on the bed and later discovered two of Lemon's teeth, with the "whole root" attached, under the rug.

Medics rushed Lemon to the hospital and straight into a trauma room. Lemon was given roughly three times her blood volume to improve her blood pressure. Doctors shocked her heart and gave her epinephrine fifteen to twenty times to restart her heart. Despite these efforts, Lemon died three to four hours later of hemorrhagic shock. She was twenty-one years old.

Hicks woke up the next day in the hospital and asked about Lemon. Officers Brendan Welsh and Nick Schlosser set up an audio-recorder in Hicks's hospital room and interviewed him. According to Hicks, Lemon was angry because she just found out from Facebook that Hicks had been cheating on her "on and off for ten years." Hicks told them Lemon hit him with a pan and was trying to stab him. Hicks told the officers: "I hit her once probably, twice, all I was trying to do was get this girl up off of me."

6

He later admitted hitting her as many as four times in the head. Hicks also said Lemon tried to stab him in the heart. He showed the officers he had four or five cuts to his chest and neck. But Hicks said he was able to take the knife from her. He admitted cutting her multiple times "anywhere" on her body. He also said he "knew he was stronger than her, that [he] could get away from her." Hicks told the officers he last smoked PCP four days before the stabbing. When Hicks was discharged from the hospital, he left in police custody.

The State charged Hicks with murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2015). He pleaded not guilty claiming self-defense and intoxication. Hicks filed a motion to suppress his statements to Officers Tuegel, Welsh, and Schlosser. After concluding Hicks was not in custody when questioned at the hospital, the district court denied Hicks's motion to suppress. Hicks also filed pro se motions requesting a change of venue and a new presiding judge. Hicks also filed a pro se motion seeking substitute counsel and claiming his legal team treated him poorly and lied to him. The court set Hicks's motion for hearing. At the hearing Hicks expressed his dissatisfaction with his attorneys and the court. The court denied his motion for substitute counsel.

Hicks waived his right to a jury trial and requested a change of presiding judge. The court noted his waiver of a jury trial, denied his request for a change of judge, and proceeded with a bench trial. Several responding officers and emergency medical personnel testified, as did Officers Tuegel, Welsh, and Schlosser. Lemon's mother and sister also testified about Hick's threatening phone calls. Both parties also presented expert testimony regarding the intoxicating effects of PCP. Hicks testified in his own defense.

*Hicks*, 2018 WL 1433788, at *1-3 (alterations original).

Before trial, petitioner filed a motion to compel evidence relating to a glass table that was broken during the fight. The State claimed that it did not have custody of the evidence petitioner sought, so it was never turned over to him. *Hicks v. State*, No. 20-0610, 2021 WL 5918312, at *2 (Iowa Ct. App. Dec. 15, 2021). After a six-day bench trial, the court found petitioner guilty of first-degree murder, in violation of Iowa Code section 707.2(1)(a) (2017). *Id.*

7

Petitioner appealed his conviction, raising several claims including prosecutorial misconduct, asserting a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), alleging the State suppressed the evidence relating to the glass table. *Hicks*, 2018 WL 1433788, at *10. He also contested the victim's cause of death and claimed ineffective assistance of counsel. *Id.*, at 11. The Iowa Court of Appeals found no evidence the State suppressed any evidence, but the Iowa Court of Appeals affirmed his conviction. *Id.* The court also found the record was not adequately developed to decide the issue of ineffective assistance but preserved the claim for PCR proceedings. *Id.* Petitioner did not seek further review by the Iowa Supreme Court.

### B. Petitioner's First State Post Conviction Relief Case

On August 2, 2018, petitioner filed a state post-conviction relief ("PCR") petition raising issues of ineffective assistance of counsel. *Hicks*, 2021 WL 5918312, at *2. In this first PCR petition,

> [h]e raised several issues, including a claim of ineffective assistance of trial counsel based on his counsel's failure to hire medical experts to testify about his post-traumatic stress disorder (PTSD) and the cause of [the victim's] death, and their failure to aggressively search for the glass and other items from the broken table. He alleged the State withheld that evidence. [Petitioner's] attorneys amended the application twice, although the claims stayed largely the same. One of his PCR attorneys eventually requested to see the glass shards, which was "brought to the Law Enforcement Center and [the attorney] photographed the evidence."

2021 WL 5918312, at *2 (last alteration original).

The State filed a motion for summary judgment. *Id.*, at *3. On March 20, 2019, the district court granted summary judgment in favor of the state. *Id.* The district court found the cause of death and prosecutorial misconduct claims had already been decided on direct appeal. *Id.* The district court denied petitioner's motion to amend his petition to allege a prosecutorial misconduct claim. *Id.*, at *4 n.1. The district court also found

8

no evidence petitioner suffered from PTSD and found petitioner did not suffer prejudice from his attorney's failure to call experts to testify about petitioner's mental illness or the victim's cause of death. *Id.*, at *3.

Petitioner appealed, and on December 15, 2021, the Iowa Court of Appeals affirmed the district court. (*Id.*, at *7).

On February 7, 2022, the Iowa Supreme Court denied petitioner further review on his first post-conviction petition. (Doc. 8, at 2-4). The Iowa Supreme Court agreed with the district court that petitioner had already raised the alleged *Brady* violation issue on direct appeal and thus could not be raised again in a PCR action. *Id.*, at *4. In so holding, the Iowa Court of Appeals found the district court did not abuse its discretion when it denied petitioner's motion to amend his petition to raise a new prosecutorial misconduct claim. *Id.*, at n.1. The Iowa Supreme Court went on, however, to find that even if the issue had not already been decided on appeal, petitioner could not make out a *Brady* violation.

> While [petitioner's] PCR counsel ultimately found the evidence the State claimed it never had, there is no evidence the State suppressed it from the defense. The evidence was easily located and promptly turned over once PCR counsel decided to look for it. Trial counsel had the same ability to find it—it was always listed on the inventory logs. [Petitioner's] attorneys had all the information they needed to obtain the glass shards. Thus, there was no suppression. *See* [*State v.*] *Sauvain*, [No. 20-0164,] 2021 WL 811175, at *3 [(Iowa Ct. App. Mar. 3, 2021)].
>
> Similarly, [petitioner] cannot establish that any alleged suppression of evidence was material. [Petitioner] wanted to use the handful of glass shards to establish that some of [the victim's] 113 "sharp force injuries" were due to something other than his stabbing her. By reducing the number of wounds he inflicted, [petitioner] wants to reduce the amount of violence he committed to a level reasonable for self-defense. This argument is unpersuasive. Even if some of the victim's cuts were caused by the shattered glass, [petitioner] still admitted to stabbing [the victim] "anywhere on her body," including her head and chest, many times. Testimony indicated that while the glass could have caused some small cuts, most of

9

her wounds required something to "penetrate into them," which was unlikely with small shards of glass. Finally, officers observed blood throughout the apartment, not just near the broken glass table. There was overwhelming evidence that [petitioner] took control of the weapon and continued to attack [the victim] well beyond what would be reasonable for self-defense. Thus, introduction of evidence showing a handful of her wounds were caused by glass shards would not have made a difference to the outcome of the trial. The court did not err in granting summary disposition on the claim of a *Brady* violation.

*Id.*, at *4.

The Iowa Court of Appeals also found that petitioner's trial counsel was not ineffective. *Id.*, at *4-7. In this same vein, the Iowa Court of Appeals likewise found trial counsel was not ineffective for failing to find the glass shards earlier because it would have made no difference in the outcome of the case. *Id.*, at *6 n.3.

The Iowa Court of Appeals likewise found that petitioner's PCR counsel was not ineffective. Petitioner alleged his PCR counsel was ineffective for not raising claims that the State had failed to comply with procedural rules in the filing of the motion for summary judgment (failing to file a separate statement of undisputed facts). *Id.*, at *6-7. The Iowa Court of Appeals found that PCR counsel's decision to address the merits of the motion instead of mounting a procedural defense was a strategy decision entitled to deference. *Id.*, at *7. The court also found petitioner could not show he was prejudiced by the State's procedural error because the State's motion was sufficiently clear despite the procedural error that it did not affect the court's ability to rule on the motion. *Id.* Likewise, the court found that even if PCR counsel would have objected, the court would not have denied the motion for summary judgment on that ground. *Id.*

## C.    *Petitioner's Second State PCR Case*

On March 9, 2022, petitioner filed a second state PCR petition raising issues of ineffective assistance of counsel during the appeal process. That petition remains pending

before the Iowa District Court for Dubuque County. Petitioner notes this in his federal habeas petition. (Doc. 1, at 3). In that second state PCR petition, petitioner states that he "applies for post-conviction relief from an adverse decision decision [sic] at State of Iowa, on this 22 day of 2, [sic] 2022." This petition appears to mix up the various appeals petitioner has filed (for instance, listing the result of petitioner's appeal of conviction as "denied/summary judgment," though summary judgment applies only to his first petition for PCR). Petitioner has received no response on this filing, though he asked for counsel on February 14, 2022, and has since followed up on that request on May 16, 2022.

### D. Petitioner's Federal PCR Case

Petitioner initially filed his federal post-conviction relief petition in the United States District Court for the Southern District of Iowa. On July 11, 2022, the case was transferred to the Northern District of Iowa because petitioner was convicted of First Degree Murder in the Iowa District Court for Dubuque County, located in the Northern District of Iowa. (Doc. 5).

On August 18, 2022, the Court conducted an initial review and dismissed the case because the then available public records did not reflect that petitioner sought further review from the Iowa Supreme Court on his first state PCR petition and, thus, had not exhausted his state remedies. (Doc. 6). Petitioner filed a motion to reconsider, providing the Court with proof that he sought further review. (Doc. 8). The Court accepted those pleadings and also confirmed on the updated public record that petitioner had exhausted his state court remedies, and so rescinded its prior order dismissing the case. (Doc. 9). The Court ordered respondent to file the relevant state court record and to respond to petitioner's motion. (*Id.*). On October 27, 2022, respondent filed the state court record. (Doc. 15).

On December 5, 2022, respondent filed the instant motion to dismiss. (Docs. 17; 20). Respondent argues that the Court should dismiss petitioner's case under Federal Rule of Civil Procedure 12(b)(1) because petitioner's motion contains both exhausted and nonexhausted claims. (Doc. 20, at 21-27). Alternatively, respondent urges the Court to dismiss petitioner's case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (*Id.*, at 27-63).

### III. STANDARDS FOR SECTION 2254 HABEAS CORPUS RELIEF

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). A federal court will not grant a petition for writ of habeas corpus "unless it appears that–(A) the applicant has exhausted the remedies available in the courts of the State [the exhaustion doctrine]; or (B)(i) there is an absence of available State corrective process; or (B)(ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A)-(B); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (holding that under the AEDPA, a petitioner must exhaust state remedies available). "Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). "[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *Id.* at 845.

In Iowa, a prisoner must seek review through the "ordinary and established appellate review process" which includes an application for further review in the Iowa Supreme Court. *Welch v. Lund*, 616 F.3d 756, 758-59 (8th Cir. 2010) (quoting *Dixon v. Dormire*, 263 F.3d 774, 777 (8th Cir. 2001)) (holding that an Iowa prisoner failed to

exhaust his claims in Iowa when his appeal of a state district court's decision to the Iowa Supreme Court was "deflected to the Iowa Court of Appeals[,]" and he failed to file for further review in the Iowa Supreme Court).

Even when a prisoner's claim has been fully adjudicated in state court, a federal court still may not grant habeas relief unless the state court adjudication:

(1) [R]esulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) [R]esulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003) ("In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions."). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curium) (citation and internal quotation marks omitted); *see also Nash v. Russell*, 807 F.3d 892, 896 (8th Cir. 2015) (holding that under the AEDPA, a federal court can grant habeas relief "only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States.") (citation and internal quotation marks omitted) (alteration in original).

"[C]ontrary to . . . clearly established Federal law" as referenced in § 2254(d)(1), means that the "state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law[,] or [ ] the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the

13

majority) (second alternation in original). "[C]ircuit precedent does not constitute 'clearly established Federal law' . . . ." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting 28 U.S.C. § 2254(d)(1)). Federal courts must be deferential in determining if the state court decision was based on "an unreasonable determination of the facts" as described in Section 2254(d)(2). *Id.* at 40-41. "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The burden is on petitioner, and it is a heavy one. "The AEDPA standard is difficult to meet as it is intended as 'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Nash*, 807 F.3d at 897 (quoting *Harrington*, 562 U.S. at 102-03).

## IV.    LEGAL STANDARDS

### A.    FED. R. CIV. P. 8

Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the grounds for the court's jurisdiction, . . . a short and plain statement of the claim showing that the pleader is entitled to relief[,] . . . and a demand for the relief sought."

### B.    FED. R. CIV. P. 12(b)(1)

Rule 12(b)(1) provides that a party may file a motion asserting the defense of "lack of subject-matter jurisdiction[.]" FED. R. CIV. P. 12(b)(1). A Rule 12(b)(1) motion can either attack the complaint's assertion of jurisdiction on its face, or it can attack the factual basis underlying the court's jurisdiction. *See Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015); *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In a facial challenge, the factual allegations concerning jurisdiction are presumed

14

to be true, and the Rule 12(b)(1) motion will succeed only if the plaintiff fails to allege some element necessary to invoke the court's jurisdiction. *See Branson Label*, 793 F.3d at 914. "Accordingly, 'the court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).'" *Id.* (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)).

Under a factual attack, "the trial court may proceed as it never could under 12(b)(6)[.]" *Osborn*, 918 F.2d at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). When a party attacks the very facts underpinning the court's jurisdiction, "no presumptive truthfulness attaches to the plaintiff's allegations," and the court may undertake an independent evaluation of those disputed facts. *Id.* (quoting *Mortensen*, 549 F.2d at 891). "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (quoting *Mortensen*, 549 F.2d at 891). Therefore, "the court may receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute." *Titus*, 4 F.3d at 593.

## C.    FED. R. CIV. P. 12(b)(6)

Rule 12(b)(6) provides that a party may assert the defense of failure to state a claim upon which relief can be granted by motion. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations, quotation marks, and alteration omitted). "Factual allegations must be enough to raise a right to relief above the speculative level," but "a well-pleaded complaint may proceed

15

even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Id.* at 555–56. Indeed, a theory asserted need only be plausible, which requires "enough fact to raise a reasonable expectation that discovery will reveal evidence of [the conduct alleged]." *Id.* at 556. In ruling on a Rule 12(b)(6) motion, the court must accept as true all the factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Simes v. Ark. Jud. Discipline & Disability Comm'n*, 734 F.3d 830, 834 (8th Cir. 2013) (citation omitted).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has *alleged*—but has not *shown*—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added) (citation and internal quotation marks omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* When a pleading contains no more than conclusions, however, those conclusions are not entitled to the assumption of truth. *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "[T]here is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *Leimer v. State Mut. Life Assur. Co. of Worcester*, 108 F.2d 302, 306 (8th Cir. 1940).

"Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted). A contract forming the basis for a claim for relief is "evidently embraced by the pleadings." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). Thus, "[i]n a case involving a contract, the court may examine the contract

16

documents in deciding a motion to dismiss." *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

### D. Pro Se Pleadings

Courts must liberally construe pro se pleadings. *See Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Smith v. St. Bernards Reg'l Med. Ctr.*, 19 F.3d 1254, 1255 (8th Cir. 1994); *see also Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004). Nevertheless, a court may dismiss a pro se complaint if it fails to state a claim upon which relief can be granted. 28 U.S.C. § 1915(e)(2). In reviewing an in forma pauperis complaint, a court must weigh the facts alleged in favor of the plaintiff unless they are clearly baseless. *See Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). Pro se complaints, however, must allege sufficient facts to support the plaintiff's claim. *Stone*, 364 F.3d at 914. An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## V. PETITIONER'S GROUNDS FOR RELIEF

Petitioner raises ten grounds in his petition. (Doc. 1, at 3-6).[1] They can be summarized as follows:

**Ground One:** Ineffective assistance of counsel for failing to (a) investigate, (b) call witnesses, (c) follow a court order, (d) to consult with a pathologist and forensic experts, and (e) to build an effective defense.

**Ground Two:** Prosecutorial misconduct by (a) lying to the courts about crucial evidence, (b) withholding evidence; and (c) calling witnesses who deliberately misled the courts on the circumstances.

---

[1] The Court has renumbered the last four grounds as 7 through 10 because in his motion, petitioner starts over at his seventh ground with labeling it as ground 1. The numbering makes no material difference but will make it easier to keep track of the grounds.

17

**Ground Three:** *Miranda* violations by (a) continuing questioning which tied to evidence that would not have been used as an offensive objective to prosecute; and (b) obtaining statements through psychological and coercion tactics.

**Ground Four:** Intervening causation as to (a) what caused the death, due to conflicting statements, and actually puncturing the lung that was caused, (b) the state medical examiner did not make a scientific ruling on what or who caused the death, and (c) punctured lung could have been a superseding cause of death.

**Ground Five:** The Court abused its discretion by (a) finding guilt contrary to the facts and law presented at trial, (b) failing to make a broader ruling on the evidence ruling, and (c) denying petitioner new counsel.

**Ground Six:** Weight of evidence of self-defense, asserting (a) petitioner was justified to defend himself when he was stabbed in the cheek, neck, and both hands on the night in question, (b) no defense was put up by counsel to challenge the state county attorney's claims, (c) "does size mean you can't defend oneself when there [sic] life and safety is in danger[?]", and (d) intoxication: "not did drugs cause the events to happen, but did drugs cause the reaction when the altercation started."

**Ground Seven:** Prosecutorial misconduct because the prosecutor withheld evidence and lied to the courts about evidence which was crucial to the defense "which glass from crime scene."

**Ground Eight:** Ineffective assistance of counsel for (a) failing to investigate, (b) failing to follow court order, (c) lying about trial strategy, (d) failing to call witnesses pertinent to the case, (e) failing to present expert testimony on the cause of death and wounds inflicted at the time of the altercation, (f) failing to show the court evidence and facts about the act of self-defense, (g) appellate counsel failing to make the proper showing of a *Brady* violation and not raising the claim on direct appeal, (h) appellate counsel failing to properly show the cause of death could be two or more causes, and (i) appellate counsel failing to raise the proper grounds to show ineffective trial counsel.

**Ground Nine:** Abuse of discretion by the district court and appeals court by ruling contrary to the facts and the law of the court.

18

**Ground Ten:** *Miranda* violation because petitioner was questioned while coming from a medically induced coma, and questioning continued "once revoked to stop interrogation."

## VI.    DISCUSSION

Petitioner's motion is a confused conglomeration of grounds, many of which are vague and others of which are redundant. For some of the grounds he raises, he has exhausted state court remedies; for others, he has not. Respondent moves to dismiss petitioner's habeas petition under Federal Rule of Civil Procedure 12(b), arguing that the Court should dismiss petitioner's unexhausted grounds as procedurally defaulted and his exhausted ground because each ground fails to state a claim for relief. The Court agrees with respondent's approach to petitioner's mixed petition of exhausted and non-exhausted grounds.

### A.    *Approaches to Mixed Petitions*

A "mixed petition" is "one in which some claims have been fully exhausted in state court and others have not." *White v. Dingle*, 616 F.3d 844, 846 (8th Cir. 2010). "To exhaust an available state post-conviction remedy, the petitioner must 'use the State's established appellate review procedures.'" *Armstrong v. Iowa*, 418 F.3d 924, 925–26 (8th Cir. 2005) (citing *O'Sullivan*, 526 U.S. at 845). When a petitioner fails to appeal the denial of state post-conviction relief to the state supreme court, he has failed to "exhaust the claims that were raised or that should have been raised in the state court petition." *Id.* at 926.

Federal district courts "may not adjudicate mixed petitions for habeas corpus, that is, petitions containing both exhausted and unexhausted claims." *Rhines v. Weber*, 544 U.S. 269, 273 (2005) (citing *Rose v. Lundy*, 455 U.S. 509 (1982)); *accord* 28 U.S.C. § 2254(b). When faced with a mixed petition, district courts have four options available: (1) dismiss the petition without prejudice; (2) stay the petition pending the outcome of

state proceedings, (3) allow the petitioner to delete all unexhausted claims and proceed on the remainder, or (4) if the unexhausted claims are meritless, deny them under 28 U.S.C. § 2254(b)(2). *See Rhines*, 544 U.S. at 277–78.

Here, the Court finds the appropriate option is to address all of petitioner's claims on the merits, as the Court finds them all—exhausted and unexhausted claims—to be meritless.

### B. *Petitioner's Unexhausted Claims*

The only claims before the Court in which petitioner has fully exhausted his state court remedies—meaning he has fairly presented a claim before the state by relying on a federal constitutional provision—are petitioner's: (1) *Brady* claim; (2) *Miranda* claims; (3) ineffective assistance of counsel claims; and (4) sufficiency of the evidence claims. (*See* Docs. 15-28; 15-30). Petitioner did not fairly present any of the other myriad of claims to the State court based on a federal constitutional basis.

As for all these other claims, state-court remedies are no longer available because petitioner failed to comply with the deadline for seeking state-court review or for taking an appeal. Iowa law bars piecemeal postconviction litigation and requires all claims to be included in the first postconviction relief application. IOWA CODE §§ 822.3, 822.8. Because petitioner failed to do so, he has procedurally defaulted those claims. Federal courts may not grant habeas relief based on procedurally defaulted claims if the state court's reason for finding default rests on adequate and independent state grounds. *Niederstadt v. Nixon*, 505 F.3d 832, 835 (8th Cir. 2007). Thus, all these claims are technically exhausted in the sense that petitioner has procedurally defaulted those claims under state law and is generally barred from asserting those claims in a federal habeas proceeding. *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). An inmate may evade procedural default by showing cause and prejudice. *Greer v. Minnesota*, 493 F.3d 952, 957 (8th Cir. 2007). Here, however, petitioner cannot show cause and prejudice; the

claims he raised in his second state court PCR petition are all ones he could have raised before and failed to do so. Thus, the Court finds the unexhausted claims to be meritless because the Court would dismiss them as procedurally defaulted.

Even were the Court to consider these other claims on the merits, however, the Court would still find them to be meritless upon review. Petitioner's various claims all revolve around the same subject: his belief that the State suppressed exculpatory evidence of the glass from the table that, in his view, would have shown the victim died from the glass and not from him stabbing her multiple times and beating her over the head with a frying pan. Petitioner casts and recasts his claims in various hues under various theories of prosecutorial misconduct, ineffective assistance of counsel, insufficient evidence, and abuse of discretion by the courts in ruling against him. But any reading of petitioner's 26-page response to the motion to dismiss (Doc. 22) shows that petitioner's claims all come down to his theory that the state hid exculpatory evidence from him and his defense counsel, and the state court judges failed him. To the extent that petitioner's claims having to do with this evidence are premised at all on federal constitutional grounds, they were fairly presented to the state court under his *Brady*, *Miranda*, ineffective assistance, and sufficiency of the evidence claims. Nothing else in petitioner's remaining, redundant, and vague grounds assert a violation of federal constitutional law and, therefore, are without merit in a federal habeas petition. For the reasons explained in the following section, those claims that petitioner raised and exhausted asserting a violation of federal constitutional law are without merit.

## C. Petitioner's Exhausted Claims

As noted above, petitioner has fully exhausted, in state court, claims regarding a *Brady* violation, *Miranda* violations, ineffective assistance of counsel, and sufficiency of the evidence claims. Thus, the task now before the Court is to determine whether the state court violated petitioner's federal constitutional rights. In other words, was there

an extreme malfunction by the state court in protecting petitioner's constitutional rights. *Harrington*, 562 U.S. at 102-03. The Court finds there was not.

### 1. Alleged **Brady** *Violation*

Petitioner asked for glass shards to be turned over to him, the State court ordered the state to do so, and the State mistakenly claimed it did not have the glass shards when it actually did. So, the State failed to turn over the glass shards to petitioner. And petitioner's attorney accepted the state's explanation, as did the district court. *Hicks*, 2018 WL 1433788, at *10. Petitioner claims that these facts give rise to many claims, including a so-called *Brady* violation. Petitioner fully raised the *Brady* violation claim in the state court, which rejected that claim. Petitioner alleges that the Iowa Court of Appeals' finding that the government did not commit a *Brady* violation was contrary to controlling federal constitutional law.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* Since *Brady*, the Supreme Court has further clarified the three elements of a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that the evidence must have been suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The Iowa Court of Appeals found both on direct appeal and in petitioner's first PCR case that the State did not suppress the evidence based on the ground that the government always had the evidence, its existence was established by an evidence log, and it was easily located and turned over when defense counsel actually looked at the evidence. *Hicks*, 2021 WL 5918312, at *4. The court also found the alleged suppression

was not material to petitioner's defense because even if the 113 stab wounds were reduced by some number due to glass shard cuts, it was beyond reason, given petitioner's admission to stabbing the victim and hitting her with a frying pan, that glass shards caused her death or reduced the number of stab wounds such that it would be consistent with self-defense. *Id.*, at 3-4.

The Court cannot find that the Iowa Court of Appeals' decision was so clearly contrary to federal law as announced by the United States Supreme Court that it warrants relief. To be sure, this Court might have ruled differently about whether the evidence was suppressed. That it was ultimately found by PCR counsel who insisted on seeing the actual evidence does not, in this Court's view, detract from the government's failure to turn it over when requested based on a mistaken belief it was not seized. As noted, suppression under *Brady* does not require an intentional hiding of evidence; inadvertent failure to produce exculpatory evidence can also constitute a *Brady* violation. *Brady*, 373 U.S. at 87 (stating that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). Here, petitioner asked for evidence that the government failed to produce that was arguably exculpatory, regardless of whether it was simply a mistake and regardless of whether it was later found.

Nevertheless, petitioner has not cited any United States Supreme Court case finding under these unique facts that the government's conduct here constituted the suppression of evidence under *Brady*. Nor could the Court find any such case. Generally speaking, the government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels. *See United States v. Cheatham*, 899 F.2d 747, 752-53 (8th Cir. 1990) (no *Brady* violation where defense counsel was aware of witness's existence and was not prevented from speaking

with her). Here, although petitioner could access the evidence only through the government, the failure to do so was a product of a mistake by a prosecutor and a failure of defense counsel to insist on seeing the actual evidence against his client. Thus, this mistake speaks more to lack of diligence and follow up by a defense attorney than it does to the suppression of evidence by the government. As the Eighth Circuit Court of Appeals has said, "[e]vidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence. *United States v. Stuart*, 150 F.3d 935, 937 (8th Cir. 1998). "[R]egardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his [or her] only reason for not obtaining and presenting the evidence to the Court is his [or her] lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980).

Regardless of whether the government suppressed the evidence, the Iowa Court of Appeals' conclusion that it was not material is not clearly contrary to established federal law. Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Id.* In a federal habeas case, the Court presumes the state's factual findings are correct, and a petitioner must show otherwise by clear and convincing evidence. *Barnett v. Roper*, 541 F.3d 804, 811 (8th Cir. 2008) (stating "the prisoner has the burden of rebutting the presumption of correctness by clear and convincing evidence.") (internal quotation marks omitted). Here, petitioner admitted stabbing and beating the victim. The state court credited the government's evidence that the victim had 113 stab wounds. Some puncture wounds could be anticipated if the victim fell into and broke a glass coffee table. But "[e]xperts testified at trial that while the glass may have caused some of [the victim's]

24

smaller wounds, most of the wounds involved puncturing inconsistent with loose shards of glass." *Hicks*, 2021 WL 5918312, at *6. Hence, it strains all credibility to suggest that if defense counsel would have obtained the glass shards from the government in advance of trial, that it would have made any difference in the outcome of the case. Here, the Iowa Court of Appeals' finding that there was no reasonable probability that the result would have been different had the government produced the glass shards is not clearly contrary to federal constitutional law.

Thus, the Court finds petitioner's motion without merit on this ground.

### 2. *Alleged* **Miranda** *Violations*

Petitioner alleges that the Iowa Court of Appeals' finding that the government did not commit so-called *Miranda* violations was contrary to controlling federal constitutional law. Under the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to subjecting any suspect to custodial interrogation, police are required to warn him (1) that he has a right to remain silent, (2) that any statement he does make will be used against him in a court of law, (3) that he has the right to consult an attorney and have one present during interrogation, and (4) that if he cannot afford an attorney and desires one, one will be appointed to him. If such warnings are not given, any statement elicited from one in custody may not be used against him at trial. *Id.* at 479. Here, petitioner made two statements to law enforcement officers while in custody. The first occurred while he was in the hospital. The Iowa Court of Appeals found that statement to have constituted a *Miranda* violation but found its admission at trial was harmless error. *Hicks*, 2018 WL 1433788, at *4. The next day, petitioner made another statement to officers. The Iowa Court of Appeals found petitioner waived his *Miranda* rights in that instance, his statements were voluntary, and regardless, admission of the statements would have been harmless error. *Id.*, at *4-6. The Court finds that the Iowa Court of Appeals' decisions were not clearly contrary to established federal constitutional law.

### a. Petitioner's First Statements at the Hospital

As to the first statements, the Iowa Court of Appeals noted that petitioner was tried in a bench trial and that the judge did not rely on petitioner's first statements in the Court's findings of facts and conclusions of law. *Id.*, at *4. The court further noted that the fact-finder's focus was on petitioner's prior threats to kill the victim, his motive (avoiding prosecution for his sexual relationship with her while she was underage), and the victim's extensive wounds. *Id.* Admission of evidence in violation of a defendant's constitutional rights may be harmless if the evidence is otherwise overwhelming. *See Chavez v. Weber*, 497 F.3d 796, 805 (8th Cir. 2007) (holding that "The admission of statements obtained in violation of *Miranda* may constitute harmless error where there remains overwhelming independent evidence as to the defendant's guilt."). Under *Chapman v. California*, 386 U.S. 18, 24 (1967), a constitutional violation requires reversal of a conviction unless the violation is shown to be harmless beyond a reasonable doubt. Under a federal habeas standard of review, petitioner must show that every fair-minded juris would agree that the violation here was not harmless beyond a reasonable doubt. *Brown v. Davenport*, No. 20-826, 596 U.S. __, 142 S. Ct. 1510, 1529 (2022). This means that petitioner must show that the verdict would have been different but for admission of the evidence. *Id.*, at 1525.

Here, petitioner cannot make that showing. The Iowa Court of Appeals' conclusion that the error was harmless and the verdict was unaffected by admission of the statement cannot be said to be contrary to established federal constitutional law. The absence of any reference to petitioner's first statement in the judge's written findings made it abundantly clear that he did not rely on that statement in arriving at his verdict.

### b. Petitioner's Statement the Following Day

The analysis of petitioner's statements the following day is more complex because of the Iowa Court of Appeals' alternative findings. Petitioner claimed these statements

were involuntary due to his intoxication and physical and emotional condition at the time. *Hicks*, 2018 WL 1433788, at \*4. The Iowa Court of Appeals found petitioner waived his rights under *Miranda*, considering a number of facts.

> [Petitioner] was in his mid-twenties and had prior experience in the criminal justice system, telling the officers he was on parole at the time of the interview. He does not allege a limited intellectual ability. He appeared to understand the questions asked and responded appropriately. The officers did not use deception or any coercive tactics. The only factors highlighted by [petitioner] are his treatment in the hospital and his toxicology screen showing the presence of alcohol and controlled substances.
>
> Considering all of the voluntariness factors, we find the *Miranda* waiver was valid. Officers . . . came into [petitioner's] hospital room the morning after he was admitted and set up an audio-recorder. After [petitioner] awoke, the officers briefly chatted with him. They read [petitioner] his *Miranda* rights around 12:30 in the afternoon, stopping to confirm he understood each one. [Petitioner] initially declined to speak with officers but said he would be willing to talk with them later. When the officers returned, they repeated the *Miranda* warnings and confirmed [petitioner] understood each right; this time he agreed to tell the officers what happened.
>
> The officers did not employ intimidating, coercive, or deceptive means to induce [petitioner] to waive his *Miranda* rights. On the contrary, the recording verifies the officers used calm voices when approaching [petitioner] and confirmed his desire to talk with them. The officers even helped [petitioner] get the bottled water he preferred to the hospital's filtered water and offered their cellular phones to [petitioner] when he said he wanted to call his father but couldn't reach him on the hospital's phone. The State proved [petitioner] voluntarily waived his *Miranda* rights.
>
> The recording also reveals [petitioner] waived his *Miranda* rights knowingly and intelligently. Both times the officer provided the *Miranda* warnings, [petitioner] confirmed he understood each right and the implications of waiver. [Petitioner] argues he could not make a knowing and intelligent decision due to the residual effects of sedatives and illicit drugs in his system. But a treating physician kept [petitioner] sedated until the illicit drugs left his system. And [petitioner's] conversations captured by the recording indicate he was aware of his situation and could

27

communicate effectively with others. For example, he was able to recite his parents' phone numbers to hospital staff, express concern about physical discomfort resulting from a catheter, and discuss the medical purpose of a blood draw he initially did not want. Given [petitioner's] ability to interact coherently and his affirmative indications he understood the *Miranda* warning and still wished to talk with officers, we conclude the State proved [petitioner's] decision-making abilities were not impaired by the effects of sedatives or illicit drugs and his waiver was knowingly and intelligently made.

*Id.* at *5.

The Iowa Court of Appeals did not misapply controlling federal constitutional law in reaching this conclusion. "To make a knowing and intelligent waiver, the defendant must have 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Courts have repeatedly found a voluntary waiver of constitutional rights under very similar circumstances. *See, e.g.*, *United States v. Cristobal*, 293 F.3d 134, 140–43 (4th Cir. 2002) (finding defendant's waiver of his *Miranda* rights, prior to police officers conducting interrogation of him while hospitalized, was valid even though he had been given pain killers and narcotics before the waiver); *United States v. Morris*, 287 F.3d 985, 988–89 (10th Cir. 2002) (finding defendant's *Miranda* waiver and statements to agent while he was in the hospital and on pain killer medication after being shot twice were knowingly, voluntarily and intelligently made and were not coerced); *United States v. Guay*, 108 F.3d 545, 550 (4th Cir. 1997) (stating "a defendant may voluntarily waive his rights even when in the hospital, on medication, or in pain").

The Iowa Court of Appeals also found petitioner's statements were otherwise voluntary, even if he did not knowingly waive his rights under *Miranda*.

As noted above, [petitioner's] conversations captured by the recording do not reveal an impairment from either the lingering effects of

medically administered sedatives or from his own use of illicit drugs. [Petitioner] does not sound distraught or irrational on the recording. He comprehends the officers' questions and gives coherent answers. Because [petitioner's] statements to Officers . . . were voluntary, the district court properly allowed them into evidence.

*Hicks*, 2018 WL 1433788, at *6.

Again, the Iowa Court of Appeals' conclusion that petitioner's statements were voluntary was not clearly contrary to established federal constitutional law. A voluntary statement or confession may be used against a defendant in court, but an involuntary statement or confession may not. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973). A statement is voluntary if it is the product of an "essentially free and unconstrained choice by its maker." *Id.* at 225. A court must consider the totality of the circumstances to determine whether a statement is voluntary. *Arizona v. Fulminante*, 499 U.S. 279, 285–86 (1991). The court focuses on the conduct of the agents and the characteristics of the suspect, including the extent of police coercion, the details of the interrogation, the length of the interrogation, and the suspect's capacity to resist pressure to confess. *See Schneckloth*, 412 U.S. at 226. Here, the evidence is clear that petitioner's will was not overborne either by anything the officers did, nor by his medication or physical or mental state. Given those facts, which the Court presumes to be true, controlling federal constitutional law would find petitioner's statements were voluntary.

Last, the Iowa Court of Appeals found that even if the statements were obtained in violation of *Miranda*, petitioner could not show prejudice because at trial, petitioner testified and made the same statements there, as well as to friends on a jailhouse phone call. *Hicks*, 2018 WL 1433788, at *6. The state district court's conclusion is correct. Once petitioner agreed to take the witness stand and testify, *Miranda* protections dissolved. *See Michigan v. Harvey*, 494 U.S. 344, 351 (1990) (providing that, if a defendant exercises his or her right to testify on his or her own behalf, then statements

29

obtained in violation of *Miranda* may be used by the prosecution). If that were not enough, admission of essentially the same information through the recorded jailhouse call rendered any error in admission of petitioner's statements harmless beyond a reasonable doubt.

Thus, the Court finds petitioner's motion without merit on this ground.

### 3. *Alleged Ineffective Assistance of Counsel*

Petitioner alleges that the Iowa Court of Appeals' finding that his attorneys were not ineffective was contrary to controlling federal constitutional law. In order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show (1) "[his] counsel's performance was deficient," and (2) "the deficient performance prejudiced [his] defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Also, petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that those errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

Review of counsel's performance is "highly deferential." *Id.* at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Thus,

> [a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Id.* at 690. Petitioner must show that any alleged error actually adversely affected his defense. *Id.* at 693. The applicable standard is whether there is a "reasonable probability" (that is, "a probability sufficient to undermine confidence in the outcome")

that, but for counsel's error, the result of the trial would have been different. *Id.* at 694. Further, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

On federal habeas review, this Court's task is not to determine in the first instance whether a petitioner's trial counsel was ineffective. Rather, this Court's task is to determine if the state court's decision that trial counsel was not ineffective was contrary to, or involved an unreasonable application of, federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The operative federal law is the *Strickland* standard. Therefore, on habeas review, a petitioner alleging the state court erred in applying the *Strickland* standard has a heavy burden. As the Eighth Circuit Court of Appeals has explained:

> Taken together, AEDPA and *Strickland* establish a "doubly deferential standard" of review. First, under *Strickland*, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is "reasonably likely" that the result would have been different absent the errors. The *Strickland* prejudice standard is less demanding than a more-probable-than-not standard, but the difference is "slight and matters only in the rarest case." To satisfy *Strickland*, the likelihood of a different result must be "substantial, not just conceivable." Under AEDPA, we must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the *Strickland* standard is unreasonable, not merely whether it is incorrect. This standard was meant to be difficult to meet, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."

*Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (internal quotations and citations omitted).

Petitioner alleges the Iowa Court of Appeals should have found his attorneys were ineffective in several ways. The Court will address each claim separately.

### a. Failing to Evaluate or Obtain an Expert on Glass Shards

The Iowa Court of Appeals found that petitioner's counsel was not ineffective for their failure to obtain an expert witness to discuss the potential wounds caused by the shattered glass found at the scene. *Hicks*, 2021 WL 5918312, at *6. The court reasoned:

> As described above, [the victim] had over 113 "sharp force injuries" and [petitioner] admitted to beating her on the head with a frying pan four times—knocking two teeth out at the root. Experts testified at trial that while the glass may have caused some of [the victim's] smaller wounds, most of the wounds involved puncturing inconsistent with loose shards of glass. Even assuming the court granted an expert witness to testify on this matter, it would not have changed the outcome. [Petitioner] suffered no prejudice from his counsel's failure to obtain an expert witness to testify about [the victim's] wounds. As such, his counsel was not ineffective, and summary disposition was appropriate.

*Id.* (footnote omitted). This conclusion is not clearly contrary to established federal constitutional law.

Here, the Iowa Court of Appeals applied the correct standard, citing *Strickland*. *Id.* at *5. Under *Strickland*,

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91. The Iowa Court of Appeals did not clearly misapply this standard when it found counsel's decision to forego obtaining an expert to testify about glass shards was not ineffective. It was a reasonable strategic decision because the glass

shards clearly did not cause the victim's death, and petitioner had stabbed and beaten the victim so many times that a few minor puncture wounds from the glass shards could not reasonably have shown that his stab wounds were made in self-defense. For the same reason, petitioner could not show that his attorney's failure to obtain an expert on this subject was prejudicial. *See, e.g.*, *Ashker v. Class*, 152 F.3d 863, 876 (8th Cir. 1998) (rejecting ineffective assistance claim grounded in failure to present an expert witness because habeas petitioner made no showing of relevant, exculpatory information an expert would have provided); *Ellefson v. Hopkins*, 5 F.3d 1149, 1150-51 (8th Cir. 1993) (finding trial counsel's strategy to forego calling expert and rely on cross-examination of prosecution expert was not ineffective assistance of counsel).

Thus, the Court finds that the Iowa Court of Appeals' conclusion that petitioner's counsel was not ineffective on this ground was not clearly contrary to established federal constitutional law.

### b. *Discovery of the Glass Shards*

The Iowa Court of Appeals also found that trial counsel was not ineffective for failing to find the glass shards because utilizing the glass shards as evidence would not make it reasonably probable the result of the trial would have been different. *Hicks*, 2021 WL 5918312, at *6 n.3. For the same reasons stated above, the Iowa Court of Appeals' lack of prejudice finding here is not contrary to federal law. Although a more diligent attorney might not have accepted the government's assertion that it did not have the glass shards and insisted on personally seeing the government's evidence, failure to do so here does not mean that the attorney was ineffective or that petitioner was prejudiced. *See Williams v. Pash*, Case No. 17-06041-CV-SJ-ODS, 2017 WL 3611992, at *5-6 (W.D. Mo. Aug. 22, 2017) (finding defense counsel's failure to follow up with the state about the availability of a DVD of a witness interview did not fall outside the wide range of professionally competent assistance, and that petitioner failed to show

33

reasonable probability that, but for counsel's failure, the outcome would have been different).

Thus, the Court finds that the Iowa Court of Appeals' conclusion that petitioner's counsel was not ineffective on this ground was not clearly contrary to established federal constitutional law.

### c. *Failure to Obtain Expert to Testify About Petitioner's PTSD*

The Iowa Court of Appeals found that petitioner's counsel was not ineffective for their failure to obtain an expert witness to testify about how being stabbed would trigger his PTSD. *Hicks*, 2021 WL 5918312, at *6. The court reasoned:

> First, there is nothing in the record from either the underlying trial or PCR proceedings to indicate [petitioner] suffers from PTSD. There is also nothing to indicate that being stabbed by [the victim] would cause a "psychological reaction" sufficient to undermine his conviction. While we review a grant of summary judgment by permitting all reasonable inferences in the non-moving party's favor, "an inference is not legitimate if it is 'based upon speculation or conjecture.'" *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001) (citation omitted).
>
> [Petitioner's] hypothesis that he has PTSD and that it was triggered by the fight is merely speculation. In fact, [petitioner] sent letters from jail indicating that while his lawyers wanted to pursue a defense based on his PCP usage, he thought his case was "straight self-defense." He never revealed to police, the court, or his attorneys that PTSD played a role. *Cf. Linn*, 929 N.W.2d at 751-53 (finding that the court should have granted an expert witness to testify on battered-wife-syndrome because the defendant testified at length over the abuse inflicted by the victim, had told law enforcement immediately after her arrest that she was tired of being abused, and raised the issue with her attorney before trial). [Petitioner's] attorney did not breach a duty by failing to make a motion for an expert witness when there were no facts indicating the witness would be useful.
>
> Furthermore, even if [petitioner's] attorney had made a motion to request an expert witness, it would likely have been denied. Courts may grant expert witnesses at the state's expense to indigent defendants when they are "reasonably necessary" and "in the interest of justice." *State v. Dahl*, 874 N.W.2d 348, 352 (Iowa 2016); *see also* IOWA R. CRIM. P.

34

> 2.20(4).  The defendant bears the burden of demonstrating their need for the witness.  *Id.*  Our supreme court has noted that Iowa courts "remain 'committed to the liberal view on the admission of psychological evidence.'"  *Linn*, 929 N.W.2d at 750 (quoting *State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014)).  However, "[w]e discourage courts from allowing the State to pay for defense services when an indigent defendant merely seeks to embark on a random fishing expedition in search of a defense."  *Dahl*, 874 N.W.2d at 352.

*Hicks*, 2021 WL 5918312, at *5.  The Iowa Court of Appeals concluded that petitioner's theory was just that—a fishing expedition.  *Id.*

Again, the Court cannot find that the Iowa Court of Appeals' conclusion is contrary to clearly established federal constitutional law.  "To prevail on a claim of ineffective assistance of counsel for failure to call an expert witness, a movant must allege and prove the expert would have provided a viable defense."  *Carmical v. Norman*, 2014 WL 4055440, at *11 (E.D. Mo. Aug. 15, 2014).  Mere speculation and conclusory allegations are not enough to establish the prejudice prong of *Strickland*.  *See Sargent v. Armontrout*, 841 F.2d 220, 226 (8th Cir. 1998) ("[T]he burden is on the petitioner to prove that his rights have been violated.  Speculation and conjecture will not satisfy this burden."); *Wiggins v. Lockhart*, 825 F.2d 1237, 1238 (8th Cir. 1987) ("In order to warrant relief . . . a habeas corpus petitioner must allege sufficient facts to establish a constitutional claim.  Mere conclusory allegations will not suffice.").  *See also Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (finding petitioner failed to show ineffective assistance because he did not demonstrate how his case was prejudiced by not retaining an expert; "[petitioner] offered no evidence that an . . . expert would have testified on his behalf at trial.  He merely speculates that such an expert could be found.  Such speculation, however, is insufficient to establish prejudice . . . [S]peculating as to what [an] expert would say is not enough to establish prejudice.") (internal citation omitted).

35

Thus, the Court finds the Iowa Court of Appeals' conclusion that petitioner's counsel was not ineffective on this ground was not clearly contrary to established federal constitutional law.

### d. Petitioner's Post-Conviction Ineffective Assistance Claims

Petitioner asserts that his PCR counsel was also ineffective. That claim is not cognizable in a federal habeas case. Title 28, United States Code, Section 2254(i) provides that "the ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief." This statutory provision unambiguously forecloses the consideration and granting of habeas relief in a Section 2254 proceeding based on a PCR attorney's alleged ineffective assistance of counsel. That is because "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). It follows, then, that the State cannot have violated petitioner's constitutional right to effective assistance of counsel when he had no such right in the first instance.

Thus, the Court finds that petitioner is not entitled to relief on this ground.

### 4. Alleged Insufficient Evidence

Petitioner asserts the Iowa Court of Appeals violated his constitutional rights in finding there was sufficient evidence to convict him of first degree murder. "The [United States] Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979). The standard of proof beyond a reasonable doubt "[i]s an essential of Fourteenth Amendment due process" and thus applies to a state prosecution. *Id.* at 318. "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 319).

The review of a claim of insufficient evidence is nuanced in a federal habeas case. It is not for this Court to decide in the first instance whether there was sufficient evidence to convict petitioner of first degree murder. *See United States v. Whitlow*, 815 F.3d 430, 435 (8th Cir. 2016) (explaining that reviewing courts do "not reweigh the evidence or assess the credibility of witnesses" (citation omitted)). Rather, this Court's review is much more deferential. As the United States Supreme Court has explained:

> The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). In short, in a federal habeas review of a state court's ruling on sufficiency of the evidence, the due process inquiry is a narrow one because "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 655. The deferential standard does not change here simply because petitioner waived a jury trial and a judge was the fact-finder.

When the Iowa Court of Appeals reviewed the sufficiency of the evidence, it had to view the evidence in the light most favorable to the verdict rendered. *Glasser v. United States*, 315 U.S. 60, 80 (1942). That means as well that it had to accept as established any and all reasonable inferences from the evidence that tend to support the verdict. *United States v. Overshon*, 494 F.2d 894, 896 (8th Cir. 1974).

Here, the Iowa Court of Appeals properly applied the federal constitutional standard and found the evidence sufficient to prove petitioner guilty beyond a reasonable

doubt. The Iowa Court of Appeals broke its analysis down, addressing petitioner's intoxication defense separately from his self-defense claim.

### a. Sufficiency of the Evidence on Intoxication Defense Theory

Addressing the intoxication defense theory, the Iowa Court of Appeals stated:

> Hicks contends the district court erred by concluding he could form the specific intent necessary to commit first-degree murder. "Specific intent not only requires the defendant to be aware of doing an act, but doing it with a specific purpose in mind." *State v. Guerrero Cordero*, 861 N.W.2d 253, 259 (Iowa 2015) (overruled on other grounds) (quoting *State v. Rinehart*, 283 N.W.2d 319, 320–21 (Iowa 1979)). According to Hicks's appellate argument, he was too high on PCP to form specific intent to kill Lemon. To prevail, Hicks must show he was so intoxicated he "could no longer reason and was incapable of forming a felonious intent." *See id.* "[I]f intoxication negates the specific-intent element . . . , [Hicks] can only be found guilty of a lesser included offense consisting of the act without the intent." *Id.*

> Viewing the evidence in the light most favorable to the district court's ruling, we find ample evidence that Hicks could and did form specific intent to kill Lemon. While motive is not an element of murder, we have found it relevant to establish the mental elements necessary to prove first-degree murder. *See State v. Caples*, 857 N.W.2d 641, 646 (Iowa Ct. App. 2014) (holding motive evidence probative of question whether defendant acted with malice aforethought). In this case, the fact finder could have reasonably concluded that Hicks—having forewarned Lemon's mother he would "flatten" her daughter's head "like a pancake"— acted precisely on that threat by smashing his girlfriend's face with a frying pan so hard that he knocked out her two front teeth at the root.

> Moreover, Hicks's own testimony supports the district court's finding of specific intent. Hicks was able to provide a detailed account of his actions the day before the attack and the day of the attack, up until the time that Lemon allegedly became angry with him over a Facebook post. Hicks testified he could not remember the events well from that point forward. Although Hicks admitted smoking marijuana, he did not testify to using PCP either the day of the attack or the day before. In his interview with officers at the hospital, Hicks said he last smoked PCP four days before the stabbing. And although Hicks claimed at trial he had no memory of the

attack, he was able to describe defending himself on a jailhouse phone call a few days later.

Physical evidence also supports the State's theory that Hicks was aware of what occurred. In another jailhouse phone call, Hicks recounted the attack and stated Lemon tried to mace him. Investigators found the remnants of a mace container in the apartment, corroborating Hicks's recollection. He testified Lemon began the attack by throwing a phone at him in the bathroom. Investigating officers found the phone between the toilet and bathroom wall indicating Hicks accurately remembered the evening's events.

Both Hicks and the State presented expert testimony regarding the impact of PCP on a person's reasoning abilities and thought processes. On behalf of the State, criminalist Justin Grodnitzky testified a person will "feel the high effects thirty minutes to an hour. This high will last anywhere between four to six hours, and then you can have residual effects lasting twenty-four to seventy-two hours." But Grodnitzky cautioned PCP impacts each user differently and therefore the user's self-reported response to PCP is significant. Grodnitzky also found no correlation between the concentration of PCP in a person's blood and his level of cognitive impairment. Grodnitzky opined those impaired by PCP could still make conscious choices. He referenced studies involving PCP-impaired drivers who were still able to make conscious decisions to operate the vehicle. But the criminalist did caution that marijuana exacerbates the effects of PCP.

Forensic toxicologist Michael Rehberg testified on Hicks's behalf. He described PCP as "a dissociative anesthetic" meaning people intoxicated by PCP may be awake but unable to recognize their surroundings. According to Rehberg, PCP can trigger psychotic episodes and can cause an intoxicated person to "become paranoid, become fearful and respond in a negative way to those fears." To determine if a person is under the influence of PCP, Rehberg suggested attempting to interact with the person to see if he can understand the conversation. Additionally, Rehberg found a correlation between a person's blood concentration of PCP and his level of intoxication. But Rehberg also described PCP as "still just truly totally unpredictable." He believed there is no way to know with certainty how a person will react to PCP each time he uses it regardless of his blood concentration levels. Rehberg also disagreed with Grodnitzky about the effects of mixing PCP and marijuana, opining marijuana and benzodiazepines can dampen the effects of PCP if used together.

On appeal, the defense focuses on Rehberg's testimony, asserting the level of PCP in Hicks's blood (twenty nanograms per milliliter the next day) and his erratic conduct after the attack lead to the inevitable conclusion that Hicks was so intoxicated that he could not form specific intent. We disagree the expert evidence or Hicks's behavior inexorably points to the success of Hicks's intoxication defense. Both Rehberg and Grodnitzky agreed PCP's effects are unpredictable—differing from person to person. And Rehberg conceded marijuana and benzodiazepines can mitigate PCP's impact, and both were in Hicks's system at the time of the attack. Although the experts disagreed whether the degree of intoxication correlates to the level of PCP in a person's system, the court was entitled as the fact finder to evaluate the two experts and choose to believe the State's expert on that point. *See State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984).

The district court could have reasonably rejected the intoxication defense based on Hicks's ability to communicate with others after the attack. Rehberg testified a person's inability to communicate with others or failure to realize others are even present may show PCP intoxication. But Hicks was able to make demands of witnesses after he fled Lemon's apartment and responded coherently to their questions. That information, coupled with Grodnitzky's view that a person can be impaired by PCP but still understand his actions, suggests Hicks was capable of forming specific intent.

The district court also could have reasonably accepted Grodnitzky's view that a person's self-perception of PCP intoxication is important. Hicks told his father from jail that he was not intoxicated and "there was nothing wrong" with him at the time of the attack. Hicks also complained to friends that his "lawyer is trying to use the PCP/self-defense but I know it was straight self-defense on my part." Given Hicks's ability to remember the attack during his interview with officers, his statements indicating he did not feel intoxicated, his failure to identify his most recent PCP use at trial, his ability to communicate with neighbors immediately after the attack, and the experts' agreement that PCP impacts each user differently, the record contains sufficient evidence that Hicks could form specific intent.

As to the weight of the evidence, we find no abuse of discretion in the district court's denial of a new trial. *See Taylor*, 689 N.W.2d at 134 (discussing limited appellate review). The district court had the opportunity to evaluate the expert testimony indicating PCP impacts each user differently and Hicks's own concessions that "there was nothing wrong" with him during the attack. *See Heaton v. State*, 420 N.W.2d 429, 432

(Iowa 1988) (noting a defendant's recollection of events to others negated his "blackout claim" made at trial). The district court also could consider Hicks's earlier threats against Lemon in deciding whether the intoxication defense was viable. The greater weight of the evidence concerning specific intent to kill did not tip the scales against the district court's finding of guilt.

*Hicks*, 2018 WL 1433788, at *6-8 (footnote omitted).

Here, the Court cannot find that the Iowa Court of Appeals violated petitioner's constitutional rights. The court's very thorough analysis of the sufficiency of the evidence applied the correct standard of review and cited ample evidence that justified a reasonable fact finder in reaching the guilty verdict and rejecting petitioner's intoxication defense. Under this Court's doubly deferential standard of review, the Court cannot find that the Iowa Court of Appeals unreasonably reached its conclusion.

Thus, the Court finds petitioner's claim here without merit on this ground.

### b. *Sufficiency of the Evidence on the Self-Defense Claim Theory*

Addressing the self-defense theory, the Iowa Court of Appeals stated:

Hicks also alleges the district court erred in failing to determine his actions were justified. "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any imminent use of unlawful force." Iowa Code § 704.3. The State bears the burden to prove justification did not exist. *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). To rebut Hicks's claim of self-defense, the State was required to prove one of the following: (1) Hicks started or continued the incident which resulted in Lemon's death; (2) Hicks had an alternative course of action was available; (3) Hicks did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him; (4) Hicks did not have reasonable grounds for the belief; or (5) the force used by Hicks was unreasonable. *See State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006).

Hicks contends the State did not present substantial evidence to rebut his self-defense claim. He cites his own testimony alleging Lemon was the aggressor. Hicks told officers at the hospital Lemon initiated the attack by swinging a pan at him. A neighbor testified he heard both Hicks and Lemon yelling "I'm going to kill you" the night of the attack. Based on this

41

evidence, Hicks argues he had no other course of action available and had to use force to get away from Lemon because the apartment only had one exit, and he reasonably believed he was in imminent danger based on Lemon's wielding of the frying pan and paring knife.

But even assuming Lemon initiated the attack and Hicks reasonably needed to use some force to avoid harm, the State provided substantial evidence that the amount of force used by Hicks was unreasonable. Only one knife was recovered from the scene, covered in blood from both Lemon and Hicks. From this evidence, the fact finder reasonably could conclude Hicks disarmed Lemon and then launched his own knife attack, stabbing her 113 times. Lemon also suffered blunt-force trauma and two of her teeth were knocked out. The medical examiner classified Lemon's wounds as defensive. Given the extreme nature of Lemon's injuries, the record contains sufficient evidence supporting the State's position that the brutality used by Hicks far exceeded what was necessary to protect himself, defeating Hicks's self-defense claim.

Hicks's weight-of-the-evidence argument also fails on his justification defense. While Lemon's injuries alone weigh in favor of unreasonable force, they provide even more persuasive proof when compared to Hicks's superficial cuts, the longest measuring three centimeters. The greater weight of the evidence supported the court's rejection of Hicks's self-defense claim.

*Id.* at *8-9 (footnote omitted).

Here, again, the Court cannot find that the Iowa Court of Appeals violated petitioner's constitutional rights. The court's very thorough analysis of the sufficiency of the evidence on the claim of self-defense applied the correct standard of review and cited ample evidence that justified a reasonable fact finder in reaching the guilty verdict and rejecting petitioner's self-defense theory. Under this Court's doubly deferential standard of review, the Court cannot find that the Iowa Court of Appeals unreasonably reached its conclusion.

Thus, the Court finds petitioner's claim here without merit on this ground.

## VII.   CERTIFICATE OF APPEALABILITY

A certificate of appealability may be granted only when a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336–37 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076–77 (8th Cir. 2000); *Mills v. Norris*, 187 F.3d 881, 882 n.1 (8th Cir. 1999); *Carter v. Hopkins*, 151 F.3d 872, 873–74 (8th Cir. 1998); *Ramsey v. Bowersox*, 149 F.3d 749, 759–60 (8th Cir. 1998); *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox*, 133 F.3d at 569. Thus, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must show that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Here, the Court finds that petitioner has not made the necessary showing for his habeas claims. Thus, the Court will not grant a certificate of appealability. If petitioner desires to seek further review of his petition, he may request a certificate of appealability from a Judge of the United States Court of Appeals for the Eighth Circuit. *See Tiedeman v. Benson*, 122 F.3d 518, 520–22 (8th Cir. 1997).

## VIII. CONCLUSION

For these reasons, the Court **grants** petitioner's "Motion to move forward" (Doc. 24) and accepts his untimely response and supplemental response. The Court also **grants** respondent's motion to dismiss (Docs. 17; 20), **denies** petitioner's petition for habeas relief (Doc. 1), and enters judgment against petitioner and in favor of respondent. No certificate of appealability will be issued for any of petitioner's claims.

**IT IS SO ORDERED** this 17th day of February, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa